IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                   **Case No. 06-40057-01-RDR**

JULIAN ROCHA,

        Defendant.

## MEMORANDUM AND ORDER

This matter is presently before the court upon the following motions filed by the defendant Julian Rocha: (1) to suppress; (2) to suppress evidence seized from cellular phones; and for discovery. The court has held several hearings on these motions and is now prepared to rule.

The charges arise from a traffic stop on November 12, 2005. The defendant is charged with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).

**MOTION TO SUPPRESS**

The defendant contends that the evidence seized during the stop should be suppressed because the law enforcement officer did not have reasonable suspicion to justify a stop for a traffic violation. During the various hearings in this case, the government presented the testimony of several law enforcement

officers who were either involved in the traffic stop or the matters that occurred after the stop. The defendant offered the testimony of John Glennon, an expert witness. Having carefully considered the evidence presented, the court now makes the following findings of fact and conclusions of law.

*Findings of Fact*

On November 12, 2005, Tracey Trammel, a deputy with the Shawnee County Sheriff's Office (SCSO), was patrolling Interstate 70 near Topeka, Kansas. Deputy Trammel is an experienced law enforcement officer. He has been with the SCSO since March 1997. He has extensive training in drug interdiction.

At approximately 2:19 p.m., Deputy Trammel observed a recreational vehicle (RV) traveling east cross the fog line three times. This observation was made on I-70 about three miles west of Topeka. On the last occasion, he noticed that the RV was roughly two feet outside the fog line. The weather conditions were cool with a breezy to gusty wind. Deputy Trammel observed other large vehicles at the same time and did not find that any of them were having difficulty staying within their lane of travel. He testified that he takes all factors into account, including road and weather conditions as well as the vehicle in question, when deciding whether to stop a vehicle for failure to maintain a single lane of travel. The roadway was dry and it was a clear, sunny day.

The defendant presented records from the National Climatic

Data Center of the United States Department of Commerce for Topeka, Kansas showing a wind speed of 23 knots per hour at 1:53 p.m. on November 12th with gusts to 36 knots per hour. The wind speed at 2:53 p.m. was 17 knots per hour with gusts again to 35 knots per hour. The surface weather observations are identified in the data by the nearest city and by latitude and longitude. There was no testimony identifying the specific distance between the weather station and location of the traffic stop. The hourly wind speeds appearing in the data are measured in knots. The website for the National Climatic Data Center gives a conversion table of 1 knot equal to 1.1515 miles. Accordingly, the wind speed in miles per hour would be approximately 26 miles per hour with gusts to approximately 41 miles per hour at 1:53 p.m., about thirty minutes prior to the traffic stop. The wind had lessened slightly at 2:53 p.m., about thirty minutes after the stop. The wind was blowing then at about 20 miles per hour with gusts at approximately 40 miles per hour.

Deputy Trammel believed that the driver of the RV might be impaired or tired. He turned on his emergency lights. The RV was slow to pull over, traveling approximately 3/4 mile before stopping on an exit ramp. This initially aroused Deputy Trammel's suspicion, but he did not believe that the RV was attempting to flee. He made no use of his siren prior to the stop. The RV was a 2005 Tioga. It measured 23 feet in length.

Deputy Trammel made contact with the driver. He asked for his driver's license, registration and proof of insurance. The driver told Deputy Trammel that he did not have a driver's license. He said he was driving because his brother-in-law had gotten tired. Deputy Trammel noticed that the driver appeared very nervous. Deputy Trammel admitted, however, that this condition is not unusual for people he stops for traffic violations. He noted there were three other passengers in the RV, a man, a woman and a small baby.

The driver eventually produced a rental agreement and proof of insurance. He also subsequently produced a California identification card. The card identified the driver as Gerardo Gaxiola. The rental agreement indicated that the lessee was Julian Rocha. The rental agreement showed the rental dates as November 9, 2005 to November 21, 2005.

Deputy Trammel had a brief conversation with Gaxiola. Gaxiola said they were traveling to St. Louis for Thanksgiving to see his cousin. He further indicated that he did not know where his cousin, Mary, lived in St. Louis. Deputy Trammel found the following suspicious: (1) Gaxiola did not know where his cousin lived in St. Louis; and (2) the rental agreement provided for a return date prior to Thanksgiving.

Deputy Trammel obtained driver's licenses from the other adults in the RV. One of the passengers was Erika Rocha, the wife

of the driver.  The other passenger was Julian Rocha, the driver's brother-in-law.  Erika told Deputy Trammel that they were traveling to St. Louis to see his husband's cousin, Maria.  She further stated that they did not fly because there were no flights available.  Deputy Trammel again found this explanation suspicious because of the availability of numerous flights around holidays. Deputy Trammel then talked with Julian.  He said that he had rented the RV because he was the only one with a credit card.

Deputy Trammel ran various checks on the individuals in the RV.  He found nothing on the Rochas.  He, however, was informed that Gaxiola had a warrant in California.  He waited for his dispatcher to confirm the warrant.

After learning about the warrant, Deputy Trammel returned to talk with Gaxiola.  He asked additional questions.  Gaxiola told him that he had only been arrested once, for driving under the influence.

Deputy Trammel subsequently learned that the warrant had not been confirmed by California.  He then went back to talk with Gaxiola.  He returned all of the documents he had received and gave Gaxiola a warning ticket for failure to maintain a single lane of travel.  He told Gaxiola "thank you" and proceeded to step aside. He then asked Gaxiola if he could ask him some more questions. Gaxiola agreed to talk with him.  He asked him if he had any drugs or contraband.  Gaxiola responded in the negative.  He then asked

Gaxiola if he could search the RV. Gaxiola said he could. Deputy Trammel then asked the other passengers if he could search the RV. Erika and Julian agreed to the search. At the time all of the passengers consented to the search, Deputy Trammel was in full uniform and was wearing a firearm. Deputy Trammel had previously requested some back-up officers. They had arrived on the scene prior to the consents to search. The other officers were dressed similarly. The officers made no showing of force during the questioning. Deputy Trammel questioned all of the passengers in a normal tone of voice. He noted that none of the passengers had any trouble speaking or understanding English.

    The passengers, including the baby, left the RV. Erika, Julian and the baby sat in one of the officer's vehicles. Deputy Trammel noted that Gaxiola remained nervous during the search of the RV.

    The officers began searching the RV. They discovered an ice chest that was sitting between the front seats of the RV. They opened the lid and noticed the presence of glue. They took the ice chest apart and discovered what appeared to be bundles of cocaine. The substance was field tested and was positive for cocaine. The cocaine weighed 27.05 pounds. At 2:59 p.m., the officers arrested the passengers and had the RV towed.

    The officers found four cell phones during their search. Julian had a blue cell phone on his person. Erika appeared to

possess a black cell phone as it was found in her purse. There were two more found in a black garment bag in the RV. Deputy Trammel noted that it was quite common for drug smugglers to have cell phones. He stated that they are used to control the delivery of the drugs and to determine the location of the individuals possessing the drugs.

The stop was videotaped by a camera positioned in Deputy Trammel's vehicle. Although the camera is purportedly started when the emergency lights are activated, the videotape begins when the RV is already stopped.

David Jones, a detective with the Platte County Sheriff's Department who has been assigned to the Drug Enforcement Agency (DEA) task force, arrived at the Shawnee County Jail at 5:20 p.m. to interview the passengers of the RV. He talked with Erika Rocha and Gaxiola, who provided statements. Erika Rocha told Detective Jones that the black garment bag found in the RV that contained two cell phones belonged to her husband, the defendant. Julian Rocha invoked his privilege to remain silent and did not provide a statement.

Detective Jones examined the cell phones that had been discovered during the search of the passengers and the RV. He did so without a search warrant. He recovered contact lists, numbers dialed and recent calls from each of the phones. He indicated that he recovered no other information from the phones.

Brian Smith, a trooper with the Kansas Highway Patrol who also was assigned to the DEA task force, arrived at the Shawnee County Sheriff's Office at mid-afternoon on November 12th. He began downloading the information from the cell phones seized at the traffic stop prior to 5:00 p.m. He did so without a search warrant. At that time, the defendants were in custody and had no access to the phones.

Glennon, a forensic automobile technologist, offered testimony about the intended use of a single white line as a fog line, the purposes of a road shoulder, and some of the circumstances for lawfully crossing a fog line and encroaching upon the shoulder. He noted the following as variables that can influence a driver's ability to maintain a single lane of travel: (1) road conditions including slopes and irregularities; (2) type of vehicle including size, height, center of gravity; (3) the abilities of the driver; (4) the weather, but primarily the wind; (5) the terrain including hills, valleys and trees; and (6) the actions of other drivers. Glennon went to the area where the traffic stop occurred and videotaped various vehicles as they drove east on I-70. He noted that almost all of the vehicles, including several that were similar to the RV involved in this case, touched and crossed the fog line on several occasions. He found that eight of the eleven vehicles encroached on the shoulder at some time as he followed them. The wind on the day that he videotaped was only five to ten

miles per hour. He opined that strong winds affect the travel of vehicles, particularly RVs. He suggested that all vehicles would probably deviate from their lane when winds reach 45 miles per hour. Glennon recognized that the wind on November 12th was from the south and would ordinarily push a vehicle traveling east on I-70 away from the fog line. He noted, however, that in such circumstances, drivers will counter steer to prevent their vehicles from being pushed in the direction of the wind. Such action will cause the vehicles to weave about their lane of travel and make it difficult for them to stay in one lane. Glennon also noted that the particular chassis that this RV rests upon is known for poor stability.

Deputy Trammel watched the videotape shot by Glennon and agreed that several of the vehicles had drifted across the fog line. He noted that he probably would have followed several for a longer period of time to determine if they continued to cross the fog line. He reiterated that he attempts to assess all factors, including road and weather conditions, before he decides to stop a vehicle for failure to maintain a single lane of travel. He acknowledged that the sight of a law enforcement vehicle in the rearview mirror can cause a driver to proceed erratically. He again stated that on the day of the traffic stop he did not notice other vehicles having significant problems maintaining a single lane of travel.

*Conclusions of Law*

A traffic stop is a seizure under the Fourth Amendment. United States v. Taverna, 348 F.3d 873, 877 (10th Cir. 2003). To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

The defendant contends that Deputy Trammel lacked reasonable suspicion to stop the RV for violating K.S.A. 8-1522(a)[1], which provides as follows:

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, .... [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

An officer's observation of a vehicle straying out of its lane multiple times over a short distance creates reasonable suspicion that the driver violated K.S.A. § 8-1522(a) so long as the strays

---

[1] Although the defendant was a passenger in the RV, he has standing to object to the stop. United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989).

could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement. United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999). See, e.g., United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003); United States v. Zabalza, 346 F.3d 1255, 1258-59 (10th Cir. 2003). Implicit in these decisions is the notion that when a vehicle repeatedly crosses out of its lane without apparent justification, an officer may reasonably suspect that the driver did not purposely move out of the lane and, thereby, failed to first ascertain that one or more of those departures could be "made with safety," in violation of K.S.A. § 8-1522(a).

The defendant does not dispute that Deputy Trammel saw the RV move from its lane and onto the shoulder of the road three times. Instead, he suggests that Deputy Trammel lacked reasonable suspicion to stop the vehicle in which he was riding for a violation of K.S.A. 8-1522(a). He argues there are four factors that preclude a finding of reasonable suspicion: (1) the intensity of the wind; (2) the nature and size of the RV; (3) the deviation from the lane of travel was minor; and (4) the RV crossed the fog line, not the center line.

Having carefully reviewed the totality of the circumstances, the court is not persuaded that Deputy Trammel lacked reasonable suspicion to stop the RV for a violation of K.S.A. 8-1522(a). The evidence is undisputed that the RV crossed the fog line on three

occasions in a short distance. The court does not find this deviation from the lane of travel to be minor as suggested by the defendant. The court also does not find that the combination of the wind and the type of vehicle preclude a finding of reasonable suspicion. There is little question that there was significant wind on the day of the stop. The records from the National Climatic Data Center, as well as the videotape of the stop, support this finding. Moreover, the combination of the size of the RV and the gusting winds might have made it more difficult for Gaxiola to keep the truck from drifting occasionally onto the fog line. However, Deputy Trammel testified that he observed no other vehicles, including those similar to the RV, move as erratically as the RV did. The court found this testimony credible. The court's role is not to decide whether the facts are sufficient to sustain a conviction under K.S.A. 8-1522(a), but to determine whether they are adequate to form an objectively reasonable suspicion that the RV was operated in violation of this statute. The reasonable suspicion analysis is not a license to conduct unrealistic second-guessing of police officers or to ignore the appropriate deference due trained officers. The court believes that, under the circumstances as indicated during the testimony provided at the hearing, Deputy Trammel had objectively reasonable suspicion that K.S.A. 8-1522(a) had been violated. Given this finding, the court holds that the initial stop of the RV was justified and reasonable.

Accordingly, the defendant's motion to suppress must be denied.

**MOTION TO SUPPRESS EVIDENCE SEIZED FROM CELLULAR PHONES**

The defendant seeks to suppress the evidence that was seized from the cellular phones because law enforcement officers retrieved information from them without a search warrant in violation of the Fourth Amendment. He also suggests that the retrieval of numbers from the phones violated the Electronic Communications Privacy Act (ECPA).

The government initially contends that the defendant lacks standing to contest the search of the cell phones other than the one that was on his person at the time of his arrest. The government further argues that the subsequent recovery of data from the cell phones did not violate the defendant's Fourth Amendment rights. Finally, the government asserts that the defendant's alternative argument lacks merit because the ECPA does not apply here.

"It is the defendant's burden to establish standing to challenge a fourth amendment violation." United States v. Dewitt, 946 F.2d 1497, 1499-1500 (10th Cir. 1991), cert. denied, 502 U.S. 1118 (1992). "A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own constitutional rights have been violated," and in the context of a search, "the defendant must show that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable." United States v. Higgins, 282 F.3d

1261, 1270 (10th Cir. 2002). He must prove a possessory interest or control of the cellular telephone that is lawful and legitimate. <u>United States v. Valdez Hocker</u>, 333 F.3d 1206, 1209 (10th Cir. 2003). The issue is resolved by considering whether the defendant asserted an ownership interest over the item, whether the defendant has testified to an expectation of privacy, and whether the defendant has come forward with other evidence in proof of a lawful and legitimate interest in the item. <u>Id</u>.

Based upon the evidence presented during the hearing, the court finds that the defendant has standing to contest the searches of the cell phone found on his person and the cell phones found in the black garment bag. Evidence was presented showing that the defendant had control over these cell phones. The court finds no such evidence concerning the fourth cell phone. Accordingly, the defendant lacks standing to contest the search of that phone.

Having carefully considered the arguments raised by the defendant, the court finds that the seizure of the information from the aforementioned cell phones by law enforcement did not violate the Fourth Amendment. The court finds that the automobile exception to the Fourth Amendment would allow retrieval of information from the cell phones. <u>See</u> <u>United States v. Fierros-Alvarez</u>, 547 F.Supp.2d 1206, 1213-14 (D.Kan. 2008). Because probable cause existed to believe that evidence of a crime would be found in the cell phone information, the automobile exception allows the search

14

of the cell phones just as it allows a search of other closed containers found in vehicles. Id. Accordingly, this aspect of the defendant's motion shall be denied.

The court will also deny the portion of the defendant's motion based upon the ECPA. The court finds no violation of the ECPA because no evidence was presented that law enforcement intercepted any electronic communications. United States v. Mercado-Nava, 486 F.Supp.2d 1271, 1279 (D.Kan. 2007). Moreover, even if the government violated the ECPA, suppression is not an appropriate remedy. Fierros-Alvarez, 547 F.Supp.2d at 1214. In sum, the defendant's motion to suppress evidence seized from the cellular phones is hereby denied.

**MOTION FOR DISCOVERY**

The defendant seeks an order directing the government to provide the following items of discovery: (1) Deputy Mitchell Johnson's report; and (2) copies of the videotapes of the interviews with the Rochas and Gaxiola. The defendant asserts these materials are discoverable under Fed.R.Crim.P. 16 and Brady v. Maryland, 373 U.S. 1194 (1963).

Prior to the hearing, the government indicated that it had provided a copy of Deputy Johnson's report to the defendant. At the first hearing in this case, the government stated that it had produced the videotapes and other reports requested by the defendant concerning the interviews of the Rochas and Gaxiola. With the

government's responses, the court shall deny this motion as moot.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Doc. # 15) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion to suppress evidence seized from cellular phones (Doc. # 16) be hereby denied.

**IT IS FURTHER ORDERED** that defendant's motion for discovery (Doc. # 17) be hereby denied as moot.

**IT IS SO ORDERED.**

Dated this 2nd day of October, 2008 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge